### JASTRZEMBSKI *v.* MARXHAUSEN.

1. NEWSPAPER LIBEL—JUDICIAL PROCEEDINGS—PRIVILEGE.

Where a newspaper reporter, at the suggestion of an officer at police headquarters, obtains from a wife, who came there to make a complaint against her husband, a repetition of statements made to the officer, and the newspaper publishes the same as facts without further investigation as to whether they are true or false, the publishers cannot defend an action by the husband for libel upon the ground that the article was a report of "judicial proceedings," and therefore privileged.

2. SAME—NOTICE OF JUSTIFICATION—MALICE—MEANING OF WORDS —"EVIDENCE" AND "PROOF."

"Evidence" and "proof" are not synonymous words: "Evidence" is that which tends to convince; "proof" is that which convinces. Therefore, 2 How. Stat. § 7776, which provides that notice of the truth as a justification in an action for libel, though not maintained by the evidence, "shall not in any case be of itself proof of the malice charged," does not take away from the jury the right to consider whether an unsustained notice of justification may not tend to show malice, when taken in connection with the other facts established.

3. SAME.

However, the jury should be able to find that there was bad

faith in giving notice of justification before they use that fact as evidence of malice, and an instruction which authorizes a finding of malice upon the notice alone is erroneous.

4. APPEAL—PROLIX RECORD—COSTS.

Where a record of one-half the length of that presented to the Supreme Court would have been ample to cover all the points raised on appeal, the appellant, upon reversal, was allowed to recover only one-half the cost of the record.

Error to Wayne; Hosmer, J. Submitted May 9, 1899. Decided July 11, 1899.

Case by Felix Jastrzembski against August Marxhausen for libel. From a judgment for plaintiff, defendant brings error. Reversed.

This is an action of libel based upon the following article published in the Detroit Abend Post, a German newspaper printed and published in Detroit, of which the defendant is owner:

## "ELOPED WITH ANOTHER WOMAN.

"Felix Jastrzembski Leaves Wife and Children in Need.

"The police were notified today that the 24-year old wife of Felix Jastrzembski is living, with four small children, in need and poverty, in the house at number 459 Forest avenue, where her husband, the carpenter Jastrzembski, left her in the lurch a week ago, and ran away with another woman, the 20-year old Agnes Hartung. Agnes boarded at the Jastrzembskis, and the fickle man fell in love with her, without having any regard for his family. Agnes' brother today reported his sister as missing. Where the couple have gone is unknown, though the police will endeavor to find out. Mrs. Jastrzembski found in one of her husband's coat pockets a photograph which represents him and Agnes Hartung as a couple. Here is an opportunity for benevolent-minded women to make an effort, and to ascertain how the abandoned family may be relieved from their sad want, without injuring those who have innocently fallen in want."

With the plea of the general issue the defendant gave notice that he would prove:

(1) "That said article was, in its fair and ordinary significance, true in substance and in fact."

(2) That the statements in the article "were based upon proceedings had in the police court of the city of Detroit, a public court of said city, and had and heard in public, and was a fair, truthful, and unprejudiced account and report of said proceedings had therein, and therefore privileged."

(3) That, at the request of the plaintiff, his version of the affair was published in the newspaper; that, before it was published, it was carefully read over to him, and that he expressed himself fully satisfied with it, and agreed that, if the same should be published in said newspaper, he would be fully vindicated and satisfied, and would settle and discharge defendant of any and all liability; that, at his request, a second article was published in said newspaper. These two articles were published, and are as follows:

### "WHAT FELIX JASTRZEMBSKI HAS TO SAY.

"Felix Jastrzembski, of No. 459 Forest avenue, declares that the complaints made by his wife against him are wrong and untrue. He says that he earns $12 per week, $7 of which he had given his wife to keep house. With that amount she did not get along, because she was too extravagant. He had criticised and severely protested against this, and the fight resulted therefrom which caused his wife to make such report to the police. He is an honest man, and never had anything to do with the girl Agnes Hartung; did not know of her whereabouts, nor did it concern him; says that he had worked for Wm. Monroe, on Twenty-Eighth street, truly and regularly every day, and been home every day. Hence, how anybody can claim that he had deserted his wife he could not understand,—a worse lie never existed. The talk of distress was silly, for his wife had enough supply at the house to warrant good living for weeks. The whole matter, Mr. Jastrzembski says, has been prompted and instigated by meanness, because he did not want to indiscriminately feed other people. That was the whole trouble."

Also:

"THE CASE OF FELIX JASTRZEMBSKI ONCE MORE—
MORE EXPLANATIONS.

"We have once before shown in our columns that great
wrong had been done to young Felix Jastrzembski by his
wife, who accused him of desertion and eloping with
another one; but we do repeat this today, not merely for
the frequent talk arising out of the matter, but owing to
the request of the employers of the accused, who have re-
quested us for an honorable explanation, inasmuch as the
latter is held in high esteem among his fellow workmen.
There was no reason whatever to blacken the man to the
police. The wife permitted herself to be led on slippery
ice."

Plaintiff obtained a verdict for $500; $400 injury to
feelings, and $100 for other damages. No further state-
ment of facts is necessary, except in connection with the
points determined.

*William Look* and *Ira G. Humphrey* (*Elliott G.
Stevenson* and *Leo M. Butzel*, of counsel), for appellant.

*Charles T. Wilkins* and *Oscar M. Springer*, for ap-
pellee.

GRANT, C. J. (*after stating the facts*). 1. Was
the publication privileged? The publication was not that
of the contents of papers filed in the course of judicial pro-
ceedings. It was not a report of testimony taken in court.
No witnesses had been sworn. The only document filed
in the justice's court was a complaint made for nonsupport,
and this was not known to the reporters or to defendant.
To this document no reference whatever was made in the
publication. Plaintiff's wife, her brother, and the brother
of Agnes Hartung went to police headquarters, and there
related to a police officer the alleged troubles between
plaintiff and his wife. The wife had with her a picture
of the girl Agnes and her husband, taken together. One
Jan Schmedding, a reporter for the Evening News, came
to the police officer after the wife and others had made
their statements to him. Schmedding testified that the

officer told him that a man and woman had been reported missing; that, if he wanted to get the story, he could find them on the porch; that they were just leaving the building; and that there was a runaway match. In Mr. Schmedding's own language: "I hustled out to the porch, and found Mrs. Jastrzembski, and Mr. Hartung, and a young man who said he was a brother of Mrs. Jastrzembski." Mr. Schmedding questioned the wife and the others, and obtained the picture. Just after this, Mr. Balke, the reporter for the Abend Post, came up, and Mr. Schmedding gave him the details he had derived from the parties, and showed him the picture. Neither made any further investigation as to the truth of the charges, although the reporters knew where the plaintiff lived, and the article was immediately published in the defendant's paper. Mr. Schmedding said, on cross-examination: "The report was that he was missing, and his wife told me that he was missing, and that was all I cared to know." The officer, after stating the reports made to him by this woman through an interpreter, states the interview with Schmedding as follows: "Mr. Schmedding came in just as they were leaving the door,—just going out of the office,—and he says, 'What are those people wanting?' 'Well,' I says, 'they reported a couple eloping;' and I says, 'It is quite a story for you, and they have got a picture.'" Mr. Balke testified that all the information he received before publishing the article was obtained from Mr. Schmedding. The wife charged her husband with criminal intercourse with the girl Agnes, and the police officer advised her to go to the police justice's office. She, and those with her, then went to the office of Justice Whelan, and there made similar statements to those made at police headquarters. The statements there made convinced Mr. Whelan that the charge of adultery would not lie. The wife made a complaint for nonsupport under the disorderly act, and a warrant was issued for the arrest of plaintiff. No reporters were there, and neither the defendant nor any of his employés had any knowledge, at

the time of the publication, of what had occurred at the office of Justice Whelan.

⎡ The publication was not privileged.  The conversation between the officer and plaintiff's wife was not a judicial investigation.  Reports made to police officers charging persons with crime are not privileged communications; and those who publish such reports do so at their peril. ⎦ Evidently, Schmedding did not rely upon the statements made to him by the officer.  He was simply told by him "that these parties had reported a couple eloping."  He then hurried to the parties, got their statements, relied upon them as true, and, without any further investigation, the defendant published them.  There were no court proceedings upon which to base the question of privilege. The authorities cited by counsel, based upon the publication of court proceedings, do not apply.  The statements published were not gathered from any proceedings in court, but the information was obtained from parties entirely outside of any court.  The only defense, therefore, that could be made to the publication, was its truthfulness. ⎦

2. Did the court err in instructing the jury as follows:

"If the defendant has not succeeded in proving the truth of all the defamatory statements just as charged, the fact that he has again in his plea said that the charges were true may be considered by you in estimating the damages to be awarded to the plaintiff.  *  *  *  In estimating the damages to be awarded for the publication of a libelous article, I instruct you that the plea of justification, if not sustained,—that is, a claim, such as is made by the defendant in this case, that the charges in the article are true,—if the truth of those charges is not proved, is a matter which you may have to take in consideration as a cause for increasing the damages to be given to plaintiff."

At the common law, notice of justification, and the failure to sustain it, were evidence of malice, and, by many authorities, conclusive evidence.  The rule is so stated in *Huson* v. *Dale*, 19 Mich. 30.  The rule was a harsh one, and therefore the legislature provided:

" If the defendant in any action for slander, or for publishing a libel, shall give notice in his justification that the words spoken or published were true, such notice, though not maintained by the evidence, shall not in any case be of itself proof of the malice charged in the declaration." 2 How. Stat. § 7776.

The statute abolished the rule that an unmaintained plea of justification was proof of the malice charged. Counsel treat the word "proof," used in the statute, the same as though it read "evidence." "Proof" is that which convinces; "evidence" is that which tends to convince. We must assume that the legislature used the word in its well-understood definition. "Evidence is the medium of proof; proof is the effect of evidence." *People* v. *Beckwith*, 108 N. Y. 73. That the legislature understood the definition of these two words is apparent from the fact that the law uses both words, and in such connection as to clearly show the distinction between the two. The statute, therefore, did not take away the right of the jury to consider whether an unsustained notice of justification might not be evidence tending to show malice, when taken in connection with the other facts established.

Under the above instruction, however, the jury were permitted to consider the unsustained notice of justification for the purpose of showing malice. The jury might, therefore, have put out of their consideration all the other facts and circumstances, and based a finding of malice and an increase of damages on this fact alone. We think the statute was designed to prevent such a result. The jury ought to be able to find that there was bad faith in giving notice of justification before they use that fact as evidence of malice. *Distin* v. *Rose*, 69 N. Y. 122. It is with some reluctance that I yield my assent to reversal of this case, for the reason that the attention of the court was not called by either counsel to this statute, and no request was made to instruct the jury as to its effect. It is the duty of attorneys to, at least, call the attention of the court to such matters, and to request instructions thereon. It

is impossible for a judge to always keep such matters in his mind.

3. It is urged that the court permitted the jury to give exemplary damages. It would be necessary, perhaps, to discuss this question, if that were the fact. It is a fair inference, from the instructions given, that counsel in their arguments had spoken of exemplary or punitive damages. The judge said to the jury:

"There is no such thing as damage by way of example. There is no such thing in Michigan as a permission upon the part of the jury to add damages to what they find the plaintiff has actually suffered, by way of punishment, by way of example, or for any other purpose."

It is impossible to conclude that the jury were permitted to find exemplary damages.

4. Error is assigned upon the instruction that there was no evidence that plaintiff had run away with Agnes Hartung, or had abandoned or failed to take care of his wife and family. The instruction was correct. There was no evidence to sustain either charge. Plaintiff was at his work as usual; was at his home as usual; came home as usual the night of the publication; and the record is barren of testimony that he failed to provide his wife and family with the support commensurate with his means. There was testimony of undue intimacy with Miss Hartung, but the record is barren of any evidence that they had eloped. An investigation by the reporter would have revealed the facts, and undoubtedly have prevented the publication.

5. Several questions are raised upon the admission and rejection of evidence. We do not consider it important to discuss them. The circuit judge gave a wide latitude to the defendant in inquiring into the relations between plaintiff and his wife, to show his character, and all the circumstances which could go in mitigation of damages. The trial was a long one. The cross-examination of plaintiff covers 60 pages. Nothing was excluded which would tend to show the truth of the charges made.

6. The record in this case contains 344 pages.    The bill of exceptions contains everything that happened upon the trial, including many colloquies between counsel, and between counsel and the court.    A record of less than one-half the length would have been ample to present all the points raised.    We have many times condemned this method of preparing bills of exceptions.    It unnecessarily increases the work of the court.    Defendant will recover only one-half of cost of record.

Judgment reversed, and new trial ordered.

The other Justices concurred.