**Philip T. MEDICO**

v.

**TIME, INC.**

**Civ. A. No. 79–597.**

United States District Court,
E. D. Pennsylvania.

June 25, 1980.

Peter Hearn, Charles J. Bloom, M. Duncan Grant, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

F. Emmett Fitzpatrick, Philadelphia, Pa., Charles J. Bufalino, Jr., West Pittston, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Plaintiff claims in this libel action that an article in the March 6, 1978 issue of Time Magazine erroneously labeled him as an underworld criminal figure. The magazine defends on the basis of the substantial truth of the article, and for the second time in this litigation, moves for summary judgment upon that issue. The motion will be granted, not on the basis of the truth of the statements contained in the article, but because the statements were privileged.

The article in question discussed the possible impending indictment of United States Congressman Daniel Flood. It stated that Congressman Flood had been characterized by his former aide, Stephen Elko, as "an official who used his considerable influence to direct federal contracts to people and companies that said 'thank you' in cash." It stated that a congressional investigation into Congressman Flood's activities was expected, and that investigations "by at least eight separate U. S. Attorneys' offices" were already under way. It then outlined three specific instances of suspected misconduct by Congressman Flood, the first of which concerns the present plaintiff. The challenged portion of the article reads:

Among the matters under scrutiny: Ties between Flood and Pennsylvania Rackets Boss Russell Bufalino. The suspected link: the Wilkes-Barre firm of Medico Industries, controlled by President Philip Medico and his brothers. The FBI discovered more than a decade ago that Flood steered Government business to the Medicos and traveled often on their company jet. Investigators say Bufalino frequently visited the Medico offices; agents tape-recorded Bufalino's description of Philip as a *capo* (chief) in his

Mafia family. Elko's testimony has sparked new investigative interest in the Flood-Medico-Bufalino triangle.

## THE DEFENSE OF TRUTH

In mid-1979, defendant Time Magazine moved for summary judgment on the issue of the substantial truth of the allegedly libelous material. In support of that motion, defendant submitted several affidavits, including the affidavit of John Danahy, a former FBI agent. Attached to the Danahy affidavit was a typed report on the subject of "La Cosa Nostra; Philadelphia Division," as well as a personal profile card on Philip Medico, both of which the affidavit purported to identify as official FBI documents. Both documents state that Philip Medico has been identified by an "informant" alternately code-named "PH T–3" and "PH 591–C*'" as a close associate of Russell Bufalino and a "capo" or "capodecina" in La Cosa Nostra. The affidavit stated that La Cosa Nostra is the FBI's term for Mafia, and that the "informant" was not a person, but was in fact an electronic listening device, by means of which a recording had been made. By memorandum opinion and order dated August 30, 1979, I denied the defendant's motion for summary judgment, primarily because the Danahy affidavit was not based on the personal knowledge of the affiant as required by Federal Rule of Civil Procedure 56(e). That denial was expressly made without prejudice to defendant's right to renew its motion in the event that further discovery should suggest a more competent affiant.

In the course of the August 30 opinion, I concluded that the test of the truth of the allegedly defamatory statements would be a narrow one. Defendant would be required to prove, as the article cautiously and plainly states, only that FBI agents tape-recorded Bufalino's description of the plaintiff as a Mafia chief, not what plaintiff refers to as the "underlying assertion"— that he held "an official position in an international criminal society and was en-

gaged in organized criminal activities." In his response to the present motion, plaintiff challenges this conclusion, arguing that under Pennsylvania law, "repetition of another's words does not relieve one of the responsibility of proving the truth of the underlying assertion even if he accurately ascribes all he says to the original utterer." Plaintiff's brief at 8, citing Mathis v. Philadelphia Newspapers, Inc., 455 F.Supp. 406 (E.D.Pa.1978); Corabi v. Curtis Publishing Co., 441 Pa. 432, 273 A.2d 899 (1971). While there may well be merit to this contention, I do not find it necessary to address the issue at this time, since, as will be discussed infra, the new evidentiary affidavits submitted in conjunction with this motion are insufficient to resolve the truth issue, regardless of whether the statement sued upon is given broad or narrow scope.

There are two affidavits now submitted in support of defendant's renewed motion for summary judgment. Both are by former FBI officials, and both purport to establish, by means of the same two documents previously submitted in conjunction with the Danahy affidavit, that FBI agents did in fact record Russell Bufalino's description of the plaintiff as a Mafia chief. One of the affiants, David Breen, states that from 1962 to 1972 he was in charge of an ongoing organized crime investigation conducted by the Philadelphia office of the FBI, and that at the same time he was in charge of all related electronic surveillance. He states that the La Cosa Nostra report was prepared in the Philadelphia FBI office at his direction and under his supervision, and that the personal profile card was prepared at his direction and kept in files maintained by the FBI.[1] He states that he knows, from his experience with the FBI and his familiarity with the code names assigned to the "informant," that the information in the documents was derived from a tape-recording made by means of an electronic listening device and transcribed by highly trained individuals capable of identifying the voices of the persons so recorded.

---

1. It does not appear to be contested here that the documents were prepared at the times that the documents themselves state: i. e., the report in 1971 and the card in 1965.

The other affiant, Patrick Collins, also in a supervisory position with the FBI, confirms Breen's interpretation of the documents, primarily on the basis of his "general experience with similar such reports," and his familiarity with the practice and procedure of the FBI. He states that while he was in charge of the FBI's national organized crime program in New York City, he received a copy of the Philadelphia report prepared by Breen and used it in preparing a national report on La Cosa Nostra for 1971. As to the personal profile card, he avers simply that he once saw it in FBI files.

■ I conclude that these affidavits present a wholly insufficient basis for the entry of summary judgment on the issue of truth. It is true that the factual allegations contained in the affidavits are uncontroverted, except by general denials made by plaintiff in his complaint and reiterated in his present affidavit and responsive brief. Moreover, as noted in my August 30 memorandum opinion, such general denials are ordinarily unavailing against specific factual allegations contained in a movant's affidavit. *See, e. g., Tunnell v. Wiley*, 514 F.2d 971 (3d Cir. 1975); *Smith v. Webb*, 420 F.Supp. 600 (E.D.Pa.1976). But this court must also recognize the difficulty that plaintiff would have in specifically controverting these particular factual allegations. It would be a challenging task indeed for him to "prove a negative" in this case, *see Mathis, supra*, 455 F.Supp. at 414; *Corabi, supra*, 441 Pa. at 449, 273 A.2d at 908–09, i. e., by establishing that FBI agents have *never* tape-recorded Russell Bufalino describing Philip Medico as a Mafia chief. As a practical matter, the only denial that the plaintiff can make is a general denial.

■ This practical consideration must be viewed in light of the fact that, in Pennsylvania, the burden of proof on the issue of truth rests with the defendant, not the plaintiff. It has been announced by both the legislature and the courts of this state that it is for the defendant to prove the truth of the statement, rather than for the plaintiff to prove its falsity. *See* 42 Pa.C.

S.A. § 8343; *Corabi, supra*, 441 Pa. at 449, 273 A.2d at 908. *Cf. Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979) (noting recent judicial trend toward shifting burden of proof on truth issue from defendant to plaintiff). In other words, the falsity of the defamatory statement should be presumed. *Corabi, supra.*

■ A related consideration springs from federal procedural law. Under Rule 56 of the Federal Rules of Civil Procedure, material submitted in support of a motion for summary judgment must be viewed in the light most favorable to the opposing party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The opposing party is entitled to the benefit of all reasonable doubts and inferences that may arise in connection with the motion. *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 131 (3d Cir. 1978).

In whatever light the present affidavits are viewed, they are sufficient to establish the authenticity of the attached documents as official FBI materials. Both affiants state that they are former FBI officials who, through personal acquaintance with the documents in question, are able to identify them as official FBI records maintained in the ordinary course of FBI activity.

However, even granting the authenticity of the documents, and assuming arguendo that they would be admissible into evidence at trial, I am of the opinion that a firmer factual foundation than this is necessary to establish the truth of the publication and thus to justify the granting of summary judgment in this case. Neither affiant appears to have any personal knowledge of the factual bases for the proffered documents. Even the one affiant who claims to have directed and supervised the preparation of one of the documents professes no personal awareness of the source of the information contained therein, and gives no indication that he actually participated in the gathering of that information. No affidavit has been presented by any individual who actually installed the electronic listening device allegedly used, who actually monitored it, who produced or was ever per-

sonally aware of a tape-recording made from it, who actually transcribed such a tape-recording, or who was personally aware of the identity of all the participants in any relevant conversation so recorded and capable of accurately attributing speech among them. Thus, there is no information on the present record from which this court can make any conclusive finding as to the truth of the allegedly defamatory statements contained in the FBI documents. Inasmuch as the plaintiff has repeatedly and specifically denied that he is a "capodecina" in La Cosa Nostra—he has raised a significant factual issue as to the likelihood that the FBI ever recorded anyone uttering such a description of him. The conclusion that this dispute is sufficient to prevent summary judgment upon the issue of truth is inescapable, when defendant's affidavits, replete with factual gaps and displaying only a partial basis in direct personal knowledge, are weighed against all the presumptions and inferences to which a non-moving libel plaintiff is entitled.

## THE DEFENSE OF PRIVILEGE

■ Among the possible defenses to an action for defamation, the Restatement includes, in addition to the defense of truth, a number of different common-law privileges, conditional as well as absolute. One such conditional privilege is entitled "Report of Official Proceeding or Public Meeting," and provides as follows:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611.

The Pennsylvania Supreme Court has not yet expressly adopted this provision, al-

though it has adopted its direct predecessor, section 611 of the original Restatement. *See Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963); *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963). As Judge Luongo of this court recently concluded, however, the two versions are "substantially similar," and there is every indication that the new section 611 is now the law of Pennsylvania. *Mathis, supra*, 455 F.Supp. at 415–16. Indeed, insofar as the old section 611 provided for a privilege concerning "publication of a report of ... proceedings of a[n] ... administrative body or an executive officer of the United States," it seems that the two versions are, under the circumstances of the case at bar, functionally identical.[2]

■ The privilege contained in section 611 thus should be regarded as the law of Pennsylvania, which this court is bound to follow in this diversity libel action. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Hartmann v. Time, Inc.*, 166 F.2d 127 (3d Cir.), *cert. denied*, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948). Moreover, the question of whether a privilege exists presents an issue of law for the court to determine. *See Sciandra, supra* at 606, 187 A.2d 586; Restatement (Second) of Torts § 619. I believe, therefore, that it is appropriate to consider the issue of privilege on the present motion for summary judgment.

The "official reports" privilege contained in section 611 has so far been applied by Pennsylvania courts only to records that are available to the public; its applicability to non-public records has not yet been tested. Two cases applying Pennsylvania law have unambiguously held that the privilege attaches to official reports that are intention-

2. Section 611 of the original Restatement provided in full:

§ 611. Reports of Judicial, Legislative and Executive Proceedings.

The publication of a report of judicial proceedings, or proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory there-

of, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter *which is false and defamatory*, if it is

(a) accurate and complete or a fair abridgement of such proceedings, and

(b) not made solely for the purpose of causing harm to the person defamed.

ally released to the press. In *Sciandra v. Lynett, supra,* defendant newspaper published certain defamatory and/or false material about the plaintiff—material that had been directly derived from a report of an official state investigation into a number of suspected organized crime figures.[3] The report had been publicly released to the press three weeks earlier. Citing the original section 611, the Pennsylvania Supreme Court held that "[u]pon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government." *Id.,* 409 Pa. at 600, 187 A.2d at 588. The court further held that the newspaper had done nothing to abuse the privilege, *i. e.,* by publishing something less than a substantially accurate account of the official report, or by publishing it solely for the purpose of causing harm to the person defamed. *Id.*

The other Pennsylvania case upon the subject of publicly released official reports is *Mathis v. Philadelphia Newspapers, Inc., supra.* In that case, defendants published information and a photograph supplied by the Philadelphia Police Department and the FBI, erroneously identifying the plaintiff as one of two suspects in a recent bank robbery. This court, per Judge Luongo, declined to hold that it was reasonable and non-negligent, as a matter of law, for defendants to have relied upon the accuracy of a photograph supplied by the FBI. The question of whether that reliance was reasonable enough to avoid liability for defamation, he concluded, presented a triable issue of fact for the jury. *Id.,* 455 F.Supp. at 414–15. Nevertheless, he found that the photograph and accompanying information that had been released by the police to the news media constituted an "informal" governmental report, within the ambit of the privilege contained in the new section 611. He added that under the Restatement formulation, the privilege "exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." *Id.* at 417, *quoting* Restatement (Second) of Torts § 611, comment a (1977). *Accord,* Restatement, Torts § 611 (1938). The opinion echoed the holding of the *Sciandra* case that the privilege remains a qualified one, and may be lost if abused through inaccurate publication of the official report or through publication made solely for the purpose of causing harm to the person defamed.

The documents concerned in the present case are, like the defamatory material in *Mathis,* official FBI documents. This much at least, as noted earlier, is adequately established by the Breen and Collins affidavits. In addition, the documents, like the report in *Sciandra,* relate to matters of great public interest concerning organized crime, and, in the present case, concerning the possible relationship between organized crime and an elected member of Congress. Thus, if it were to appear that these documents had been, like the official reports in both *Mathis* and *Sciandra,* properly released by the government to public use, then under the rule of those cases, they would be privileged.

It does not clearly appear on the present record, however, that we are dealing here with public documents. There is no indication one way or the other as to how these FBI materials came into the hands of the individuals responsible for preparing the magazine article in question. Thus, it is appropriate to give plaintiff, for summary judgment purposes, the benefit of the doubt on this issue, and to assume that the documents were secret and that their release to the defendant was unauthorized. Upon this assumption, therefore, the controlling question in this case is whether the section 611 privilege extends to documents which have never been intentionally released to the press or the public, but which have come into the defendant's hands only by way of an unauthorized news leak or some unlawful act.

3. One of the individuals prominently mentioned in the report (the famous so-called "Reuter Report" of 1958) and the newspaper article was, coincidentally, Russell Bufalino.

The first place to seek guidance upon this issue, of course, would be the Restatement itself. Certainly, nothing in the text of section 611 precludes the possibility that the privilege applies to non-public as well as public reports. It is stated simply that the privilege applies to "a report of an official action or proceeding." The term "official action" is defined, in comment d, to include any "report by an officer or agency of the government." In contrast, it should be noted that when the privilege is asserted as to reports of *non-official* proceedings, the Restatement unambiguously requires that such proceedings be open to the general public and deal with matters of public concern. Restatement (Second) of Torts § 611 and comment i. Indeed, the Restatement simply reflects the lack of authority upon the issue, when it states, in comment d to section 611, that "[i]t is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law." [4]

Similarly, the Pennsylvania Supreme Court in the *Sciandra* case has offered no guidance upon the public/non-public reports dichotomy. The only rationale for the section 611 privilege mentioned by the *Sciandra* court is "that it is in the public interest that information be made available as to what takes place in public affairs." 409 Pa. at 600, 187 A.2d at 588. Under the circumstances of the *Sciandra* case, it seems clear that in speaking of "public affairs," the court was not attempting a determinative distinction between public and non-public official reports, but was simply equating the word "official" as used in section 611 with the notion of public business, in the sense that all official reports, whether made public or not, issue from the public sector rather than from private individuals and are therefore of general public concern. In any event, it seems to me that such dictum is sufficiently ambiguous to invite clarification from other sources.

Absent clarification under Pennsylvania law, it seems appropriate to seek guidance from the law—statutory as well as judicially created—of other states. One related area which has received a fair amount of judicial attention in other jurisdictions is the status, under the common-law official records privilege, of police reports and other preliminary investigations by law enforcement entities—matters not ordinarily made public. There is considerable authority to the effect that the republication of such reports is not privileged. *Yerkie v. Post-Newsweek Stations, Michigan, Inc.,* 470 F.Supp. 91 (D.Md.1979); *Lancour v. Herald & Globe Ass'n,* 111 Vt. 371, 17 A.2d 253 (1941); *Burrows v. Pulitzer Publishing Co.,* 255 S.W. 925 (Mo.App.1923); *Williams v. Black,* 24 S.D. 501, 124 N.W. 728 (1910); *Billet v. Times-Democrat Publishing Co.,* 107 La. 751, 32 So. 17 (1902); *Jastrzembski v. Marxhausen,* 120 Mich. 677, 79 N.W. 935 (1899). See 53 C.J.S. *Libel and Slander* § 129. See also *Kelley v. Hearst Corp.,* 2 App.Div.2d 480, 157 N.Y.S.2d 498 (1956); *Nunnally v. Press Publishing Co.,* 110 App. Div. 10, 96 N.Y.S. 1042 (1905). These cases, however, were not decided upon the issue of whether the investigative reports were available to the public or not. Rather, the determinative question was whether the reports were sufficiently a part of the judicial process to bring them within the privilege to report judicial proceedings. The above state court cases concluded, fairly enough, that they were not.

The privilege to report judicial proceedings, however, is just one aspect of the privilege contained in section 611 of the Restatement. Other matters privileged under section 611 include reports of actions of executive officers, legislative proceedings, public meetings of a non-official nature, and quasi-judicial proceedings such as administrative hearings. Nevertheless, the tendency (only occasionally appearing in contemporary case law) to limit the privi-

---

**4.** This last phrase, "available to the public under the law," would appear to be a reference to legislation like the Freedom of Information Act, 5 U.S.C. § 552. For purposes of this summary judgment motion, it will be assumed that the documents here in question would not be available to the public under that statute, by reason of the exemption contained in § 552(b)(7), relating to "investigatory files compiled for law enforcement purposes."

lege solely to its judicial application may be understood by reference to the fact that the judicial aspect of the privilege is older and more fully developed than any other. *See The King v. Wright*, 8 T.R. 293, 101 Eng. Rep. 1396 (1799); *Pittock v. O'Niell*, 63 Pa. 253 (1870); *Dorr v. United States*, 195 U.S. 138, 152, 24 S.Ct. 808, 814, 49 L.Ed. 128 (1904); *Pulverman v. A. S. Abell Co.*, 131 F.Supp. 617, 622 (D.Md.1955). *See generally, Barnett, The Privilege of Defamation by Private Report of Public Official Proceedings*, 31 Ore.L.Rev. 185 (1952); 5 Va.L.Rev. 513 (1918); W. Prosser, Law of Torts § 118, at 830 (4th ed. 1971). Therefore, cases excluding police reports from the scope of the judicial records privilege are not particularly helpful in the present case, where the applicable law of privilege, as embodied in section 611, encompasses far more than just records of judicial proceedings. In fact, as noted earlier, Judge Luongo of this district specifically held in the *Mathis* case that even such "informal governmental reports" as police dossiers on persons suspected of criminal activity fall within the section 611 privilege. 455 F.Supp. at 416.

This is not to say, however, that the distinction, for purposes of a qualified privilege to defame, between public and non-public official action has not been explored by the courts. It has been addressed in a number of cases, always in the context of judicial proceedings, but never, as observed earlier, solely in the context of police reports or reports by other non-judicial official entities. The bulk of this case law comes from New York, where there has long been a statute governing the scope of the official reports privilege. Until 1956, the statutory privilege, contained in section 337 of New York's Civil Practice Act, applied to any "fair and true report of any judicial, legislative *or other public and offi-*

*cial proceedings."* (emphasis added). New York courts consistently found that this language meant quite plainly that the only judicial proceedings covered by the privilege were those that were both public and official. *See Kelley v. Hearst Corp., supra; Danziger v. Hearst Corp.*, 304 N.Y. 244, 107 N.E.2d 62 (1952); *Nunnally v. Press Publishing Co., supra*; 43 A.L.R.3d 634, 637, and cases cited therein. *Accord, McCurdy v. Hughes*, 63 N.D. 435, 248 N.W. 512 (1933).

In 1956, however, the statute was amended to delete the word "public." The remaining language now presents a codified version of the official reports privilege substantially similar to that contained in section 611 of the Restatement.[5] New York courts construing the new statute have extended its protection to reports of certain types of secret judicial proceedings. For example, in *Keogh v. New York Herald Tribune Co.*, 51 Misc.2d 888, 274 N.Y.S.2d 302, *aff'd*, 28 App.Div.2d 1209, 285 N.Y.S.2d 262 (1966), the privilege was extended to secret grand jury proceedings. The court indicated in that case that the secrecy of grand jury proceedings nevertheless remained intact, and that the abrogation of defamation liability in that context was independent of existing punitive sanctions for violation of that secrecy. In *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 313 N.Y.S.2d 104, 261 N.E.2d 251 (1970), *cert. denied*, 400 U.S. 999, 91 S.Ct. 454, 27 L.Ed.2d 450 (1971), although the New York Court of Appeals declined to extend the privilege to secret records filed in matrimonial actions, it nevertheless recognized that the amended statute was meant to apply "to certain quasi-judicial and nonjudicial proceedings—such as those conducted by administrative agencies—which are not generally considered to be 'public' in nature or which

---

**5.** The statute, presently codified as section 74 of New York's Civil Rights Law, provides in pertinent part:

> Privileges in action for libel
>
> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial, proceeding, legislative proceeding or other official proceeding.

The only substantial difference between this provision and section 611 does not appear to be material to the present case. I refer to the fact that the Restatement privilege is considered to be abused where the republication is solely for the purpose of defaming the plaintiff. The New York version contains no such qualification, and thus appears to be more of an absolute privilege.

might not be open to the public." 27 N.Y.2d at 17, 313 N.Y.S.2d at 110, 261 N.E.2d at 255.[6] In *Gardner v. Poughkeepsie Newspapers, Inc.*, 68 Misc.2d 169, 326 N.Y.S.2d 913 the privilege was extended, upon the authority of the *Keogh* case, to sealed court records of juvenile proceedings.

The consensus of New York law thus would appear to support an expansive reading of section 611 in the present case, affording the protection of the privilege to non-public as well as public official reports. *Accord*, La.Rev.Stat.Ann. § 14:49 (1974) ("public *or* official proceeding").

Common-law authority from other states is not quite so helpful. Of the few older decisions—those dating back to the turn of the century—involving claims of privilege as to secret court documents, none focused clearly on the public/non-public distinction as a critical point. *See* 43 A.L.R.3d 634, 641, and cases cited therein. One recent federal decision, however, contains the following language:

> If the information is contained in public records and derived from therein, there is an absolute privilege to publish. If, however, material is received from other than the public record, then the defendant newspaper assumes the risk that the information is incorrect. *Times-Dispatch Publishing Co. v. Zoll*, 148 Va. 850, 139 S.E. 505, 507 (1927).

*Mills v. Kingsport Times-News*, 475 F.Supp. 1005, 1011 (W.D.Va.1979). Although this language seems to urge fairly unambiguously a distinction between public and non-public records, the circumstances of the case indicate that this was dictum only, not entitled to any significant precedential weight upon the present issue. The applicability of the privilege in the *Mills* case did not depend upon whether the records were public or not—for the court expressly noted, at page 1011, that they undoubtedly were. Rather, the central issue concerning the applicability of the privilege was whether the defendant had colored its reporting with information not appearing on the record of the judicial proceeding in question, and had thereby published something other than an "impartial and accurate account of the event." *Id.* Similarly, in the *Times-Dispatch* case relied upon by the *Mills* court, the issue was whether the privilege had been abused by inaccurate reporting of the official proceedings, rather than whether the privilege, in cases of non-public proceedings, was applicable at all. Thus, although both courts spoke of the privilege only in terms of public records, such language does not appear in either case to be elevated to the level of a judicial holding, or intended to be dispositive of any issue before the respective courts. Moreover, even if such language had been intended to have the force and effect of law, the fact that Virginia has its own common-law privilege rather than subscribing, as Pennsylvania has, to the Restatement's, would suggest

---

**6.** It could in fact quite easily be argued that the *Shiles* court was mistaken in imposing any restriction at all upon the privilege. In the first place, the language of the statute in and of itself could arguably have been sufficient to decide the issue. The statute expressly and unambiguously extends the protection of the privilege to "*any* judicial proceeding," without hint or mention of any distinction between public and non-public proceedings. Secondly, even if it could be said that the statute is ambiguous upon this point, the proper place to seek clarification would have been the legislative history of the statute during the process of its enactment, not the post-enactment comments of the state's chief executive officer. If the legislative history had been consulted, it would probably have appeared, as the three-judge *Shiles* dissent observed, that the privilege was meant to be unrestricted, especially in light of the fact

that an amendment specifically excluding matrimonial actions from the scope of the privilege had been "defeated overwhelmingly" by the legislature. Finally, it is quite possible that the Governor's comments were misconstrued. In his memorandum of approval, appended to the *Shiles* decision, he observed that the amended statute "would make it possible to publish, as in a newspaper, *a report of a judicial*, legislative or other official *proceeding even though it is not public*," while simultaneously stressing the continuing validity of the state's various secrecy provisions. 27 N.Y.2d at 24, 313 N.Y.S.2d 115–16, 261 N.E.2d at 259 (emphasis added). As will be discussed more fully hereinafter, these two considerations are separate and distinct, and not at all inconsistent or requiring reconciliation. *See* Pp. 278–279 *infra.*

that such authority should have only minor persuasive effect upon the scope of the privilege under Pennsylvania law.

In considering whether Pennsylvania's common-law republication privilege is broad enough to apply to non-public as well as public official proceedings, it is appropriate to take into account the public interest. As long as the privilege has existed, courts have recognized that its primary justification lies in serving, as the Restatement phrases it, "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." Restatement (Second) of Torts § 611, comment a. *See The King v. Wright,* 8 T.R. 293, 101 Eng.Rep. 1396 (1799); *Sciandra, supra* at 600, 187 A.2d at 588. 77 Colum.L.Rev. 1266, 1269 (1977); 64 Colum.L.Rev. 1102, 1111–16 (1964); 31 Ore. L.Rev., *supra* at 189.

It is true that the United States Supreme Court has held that the fact that defamatory material is of great public interest is not enough to cloak it with a constitutional privilege. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion); *New York Times*

*Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A defamation is privileged under the first amendment, the Court advises us, only when the plaintiff is some sort of public figure. *New York Times Co., supra. See, e. g., Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Moreover, the Court has specifically declined to give constitutional dimension to the privilege to report judicial proceedings. *Time, Inc. v. Firestone,* 424 U.S. 448, 456, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). *Cf. Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (publication of public court records held privileged in action for invasion of privacy).[7]

Nevertheless, as a common-law principle of defamation, the official reports privilege not only exists, but appears to be universally accepted. It is appropriate, therefore, in defining the scope of the section 611 privilege, to refer to various public interest considerations, despite the relatively recent constitutional authority of the *New York Times/Gertz* line of cases.

The brand of public interest emphasized by the Restatement—that the public should

**7.** Reference to the *Rosenbloom* and *Gertz* line of cases raises the interesting possibility that the publication challenged here might be protected by a state law privilege other than that contained in section 611. Shortly after the *Rosenbloom* Court held that the publication of matters of public concern was constitutionally protected, the Pennsylvania Supreme Court did the same. *Matus v. Triangle Publications, Inc.,* 445 Pa. 384, 286 A.2d 357, *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972). The *Matus* court adopted verbatim, as the law of Pennsylvania, the constitutional holding of the *Rosenbloom* plurality (*i. e.,* that the publisher of a defamatory statement on a subject of "public or general concern" may be held liable only upon a showing of malice). *Id.* at 395, 286 A.2d at 363. However, since the time that the *Rosenbloom* holding was rejected by the United States Supreme Court in *Gertz,* the Pennsylvania Supreme Court has not had occasion to reconsider its position in *Matus.* Thus, Pennsylvania is left with a state law privilege derived exclusively from a now-void constitutional principle, so that, as the Third Circuit Court of Appeals recently observed, "Pennsyl-

vania's standard of liability for suits brought by 'private figure' plaintiffs is presently unsettled." *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 272 (3d Cir. 1980).

The court of appeals in the *Steaks Unlimited* case did not resolve the issue (finding instead that the plaintiff was a public rather than a private figure), but noted that two federal district courts had addressed the question and had come to opposing conclusions. *Id.,* 272 n.35. *See Lorentz v. Westinghouse Elec. Corp.,* 472 F.Supp. 946 (W.D.Pa.1979) (*Matus* rule still viable); *Mathis v. Philadelphia Newspapers, Inc., supra* (*Matus* did not survive *Gertz*). I endorse Judge Luongo's thorough and well-reasoned holding in the *Mathis* case, and must reject the opposing view, especially in light of the fact that the *Lorentz* court made only the briefest reference to the *Matus* decision and did not consider at all the impact of *Gertz.* I conclude, therefore, that the public concern privilege set forth in *Matus* would be, at the very best, a tenuous precedent for this court to rely upon in assessing the privileged status of the communication challenged here.

be informed as to what occurs in official proceedings—does not logically diminish simply because the proceedings are conducted behind closed doors.[8] Although a legislative or executive determination that certain official matters should be kept secret certainly affects the public's right of access to those matters, it does not necessarily dampen the public's concern about them, or the public's need to be informed about the affairs of its governing bodies. The actions or proceedings of government, whether conducted in public or not, are performed by public employees, financed with public funds, and carried out, at least ostensibly, in the name of the public good. All, therefore, fall within the scope of the public interest implicated in the section 611 privilege.

The facts of the present case demonstrate especially compellingly the inappropriateness, in terms of the public interest, of a distinction between public and nonpublic official actions. The ultimate focus of the Time magazine article in question was the possibility of unethical or criminal activity on the part of Daniel Flood, an elected United States Congressman. The article raised the possibility that there might have been ties between Representative Flood and organized crime, and that the plaintiff might have served as some sort of link between the two.[9]

The conduct of elected officials under our democratic form of self-government is of course a subject of paramount public concern; the law of defamation, especially in the constitutional context, has often deferred to it. *See New York Times Co.,*

*supra; Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 122 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). The infiltration of organized crime into various aspects of modern society is also a subject of enormous public concern. The problem has been specifically addressed by the Congress that enacted the Organized Crime Control Act of 1970, as evidenced by the Congress' accompanying finding that "organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud and corruption." [1970] U.S.Code Cong. & Admin.News 1073.

In addition, we must consider the difficulty of gathering information pertaining to organized criminal activity. Due to the size, sophistication and secrecy of most organized criminal endeavors, only the largest and most sophisticated intelligence-gathering entities can monitor them effectively. In practice, this task has been taken up primarily by the Justice Department of the federal government and, in particular, by the FBI. Thus, when the press receives information compiled by the FBI relating to organized crime—whether through authorized, official channels, through an unauthorized news leak, or even through some unlawful activity—the press can fairly presume that such information was compiled in at least as competent and responsible a manner as any other information upon the subject. To require the press to obtain independent corroboration of such information, when the information is known to

---

**8.** One writer has gleaned from the case law, in addition to this so-called "informational rationale," two alternate rationales for the republication privilege: a "supervisory rationale," whereby the public is considered to have the right to oversee the conduct of public officials, the more readily to hold them accountable therefor; and an "agency rationale," whereby the press is considered to be the eyes and ears of the public, entitled to observe whatever any member of the public, if he had the time or inclination, might observe. 64 Colum.L.Rev. 1102 (1964). These two rationales would arguably not be compatible with an interpretation of the republication privilege as applying to

nonpublic matters. However, since neither of these rationales is implicated in the language of the Restatement or Pennsylvania case law, they need not be given any weight in the present discussion.

**9.** Representative Flood, it should be noted, pleaded guilty on February 26, 1980 to a single charge of conspiracy, pursuant to a plea-bargaining agreement. He had been charged with bribery and perjury, e. g., through accepting more than $50,000 in return for using his influence as chairman of a congressional committee. Reuters Ltd. Wire Service, Feb. 26, 1980.

have been compiled by the largest law enforcement agency in the country, with particular competence in the area of organized crime, would, I believe, impose far too heavy a burden upon the much-protected freedoms of the press and the derivative right of the public to receive information upon issues of great moment. As the Pennsylvania Supreme Court stated in *Sciandra, supra*, 409 Pa. at 607, 187 A.2d at 592:

> [T]o impose liability upon the defendant under the circumstances presented, would render, "Freedom of the Press" a lie, seriously impinge upon priceless constitutional guarantees and be a substantial deprivation of the public's right to know.

Consequently, I conclude that the mere fact that a government report has not been made public does not make it less of "a report of an official action or proceeding" than any other ex parte report of a governmental agency for purposes of the section 611 privilege to republish a defamation.

■ This is not to condone in any way, however, improper news-gathering techniques. We are concerned here with the press's right to *publish* information, not the right to *gather* it. These are two related but separable rights, of which the Supreme Court has stated: "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). · *See Lewis v. Baxley*, 368 F.Supp. 768, 775–76 (M.D.Ala. 1973); *Borreca v. Fasi*, 369 F.Supp. 906, 908–09 (D.Hawaii 1974). My ruling in this case deals only with the right of the press to publish certain information without fear of liability for defamation. It is not intended to alter the general rule that the press has no right of access to information not available to the public. *Trimble v. Johnston*, 173 F.Supp. 651, 655–56 (D.D.C.1959). *See Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); *Lewis v. Baxley, supra*, 368 F.Supp. at 776. Nor is it intended to diminish in any way

the effectiveness of the various punitive sanctions available where there has been a breach of some legislative or executive decree of secrecy.[10]

Finally, some mention should be made of the exact scope of the section 611 privilege herein approved. It is of course a conditional privilege, and can be abused "by exaggerated additions, or embellishments to the account," and by publication "solely for the purpose of causing harm to the person defamed." *Sciandra, supra*, 409 Pa. at 600, 187 A.2d at 589. It differs markedly from most other conditional privileges set forth in the Restatement and approved by Pennsylvania courts, in the following respect: under section 601 of the original Restatement, it was considered an abuse of most conditional privileges to publish the defamatory matter without reasonable grounds for believing it to be true. Section 611, however, was said to differ "from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false." Restatement, Torts § 611, comment a (1938).

The second Restatement retained the view of the first that most conditional privileges might be abused by some degree of awareness of the falsity of the publication on the part of the publisher, except that the negligence standard to which the publisher was held under the original Restatement was raised to a standard of recklessness, in light of the decision of the United States Supreme Court in *Gertz v. Robert Welch, Inc., supra*. Even so, the new section 611 privilege remained a breed apart—"somewhat broader in its scope than the [other] conditional privileges" because of "the interest of the public in having information made available to it as to what occurs in official proceedings." Restatement (Second) of Torts § 611, comment a. *See id.* § 599, comment c; § 600, comment c; *Mathis, supra*, 455 F.Supp. at 417.

**10.** This much appears to have been recognized by the New York courts in dealing with the amended New York privilege statute, as in *Keogh v. New York Herald Tribune Co., supra*, and by the Governor of New York, as noted earlier, in his comments in approval of that statute, quoted in the *Shiles* case.

This appraisal of the standard of care applicable under section 611 might appear at first blush to be inconsistent with certain language in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). A plurality of the Supreme Court suggested by way of dictum in that case that Pennsylvania's section 611 republication privilege could be defeated, under Pennsylvania law, by mere negligence in failing to ascertain the truth of the matter. *Id.* at 38, 91 S.Ct. at 1817, *citing Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963). The language from the *Purcell* case cited by the Supreme Court, however, is not directly relevant to the issue of the degree of care that a defamation defendant should exercise under section 611 in ascertaining truth. The *Purcell* court appears to have been concerned with the degree of malice with which the defendant distorted and colored its account of the judicial proceedings, and simply did not address itself to the question of whether the defendant had any duty at all to ascertain the truth of the statements uttered in court. To the extent, therefore, that the *Rosenbloom* court and the *Purcell* court indicated that a negligent failure to ascertain the truth might defeat a conditional privilege, it is evident that they were referring not specifically to the section 611 privilege, but to conditional privileges in general. *See also Orr v. Dispatch Publishing Co.*, 65 York Leg.Rec. 129 (1951).

■ Thus, under the Restatement and Pennsylvania law, a defendant seeking the protection of the section 611 privilege is held to a sort of "super-malice" standard of care. The privilege that attaches to the publication of a fair and accurate account of an official action or proceeding is abused not by a negligent failure to ascertain the truth, or by a malicious failure to ascertain the truth, or even by unabashed *knowledge* of the falsity of the published account. It is abused, according to Pennsylvania law, only when publication is "solely for the purpose of causing harm to the person defamed." *Mathis, supra*, 455 F.Supp. at 417, *quoting Sciandra, supra*, 409 Pa. at 600, 187 A.2d at 589.

■ It should also be noted that the privilege does not seem to apply when the defendant publishes the allegedly defamatory statements without attribution. In that situation, it has been said that "[t]he publication constitutes a charge by the person uttering it, and he is responsible therefor." *Hughes v. Washington Daily News Co.*, 193 F.2d 922, 923 (D.C.Cir.1952) (citations omitted). *See also Medina v. Time, Inc.*, 439 F.2d 1129, 1130 (1st Cir. 1971) (in public figure libel context, test was whether defendant had asserted the truth of facts contained in the challenged statements); *Novel v. Garrison*, 338 F.Supp. 977 (N.D.Ill. 1971) (statement attributed to district attorney and not presented as defendant magazine's own opinion held not to demonstrate actual malice against public figure plaintiff). In the present case, much of the information was attributed to "Government investigators." In the particular paragraph to which the plaintiff objects, it is stated simply that *"[i]nvestigators say Bufalino frequently visited the Medico offices; agents tape-recorded Bufalino's description of Philip as a capo (chief) in his Mafia family."* (emphasis added). From this language, it certainly cannot be said that the defendant was asserting the truth of the statements, or adopting as its own opinion whatever libelous innuendo is contained in the article.

Nor is there any indication whatsoever on the present record that defendant has otherwise abused the section 611 privilege, either by inaccurately reporting the information contained in the FBI documents, or by publishing the information solely for the purpose of defaming the plaintiff.

I conclude, therefore, that summary judgment should be entered in favor of the defendant, not on the basis of the asserted defense of truth, but on the basis of the common-law privilege contained in section 611 of the Second Restatement of Torts.