BRANDON *v.* GAZETTE PUBLISHING CO.

5-2565                                     352 S. W. 2d 92

Opinion delivered December 18, 1961.

*Kenneth Coffelt, Fred A. Newth, Jr.* and *Marshall N. Carlisle,* for appellant.

*Rose, Meek, House, Barron, Nash & Williamson,* for appellee.

CARLETON HARRIS, Chief Justice.   This is a libel suit. Appellant was the operator and principal stockholder of Trinity Nursing Home in Little Rock. On July 16, 1959, Governor Orval Faubus released to news reporters at a special press conference a statement headed "Press Statement of Governor Faubus." This statement dealt with irregularities in nursing homes, and improper acts by nursing home proprietors. As far as the charges against appellant are concerned, the report dealt with conditions which an investigation had allegedly shown to exist at Trinity Nursing Home. The Chief Executive's official interest stemmed from the fact that some welfare recipients were patients in the home. The Governor revealed to the press the results of the investigation that

he had caused to be conducted, and he characterized conditions as a "sordid and shocking story of mismanagement and misdeeds." He advised that he had ordered welfare patients removed from the home, and also stated that Mrs. Brandon, an assistant part-time attorney for the Welfare Department, had been dismissed. A Little Rock evening paper carried the story of the press conference and the report there made, and a Gazette reporter, together with a photographer, went to Trinity to interview Mrs. Brandon. This meeting was apparently arranged by the then attorney for Mrs. Brandon. Appellant talked freely, and took the Gazette representatives through the nursing home. The next day, Friday, July 17th, the Gazette carried a front page story relative to the Governor's charges, and a denial by Trinity. On June 7, 1960, Mrs. Brandon instituted suit against the Gazette, seeking compensatory damages in the sum of $200,000, and punitive damages in the sum of $300,000. She alleged, *inter alia,* that the article published was false and libelous; that as a result of the publication she had suffered great embarrassment and humiliation, and had sustained a severe loss of business in connection with the operation of the nursing home; further, that her earning capacity in connection with the home had been diminished. It was further alleged that appellee knew at the time that the publication was false and libelous, or by the exercise of ordinary care, could have so known, but that no precaution was taken to ascertain from appellant, or other reliable source, the truth or falsity of the libelous publication. The Gazette answered, admitting it published the article, but denying other allegations of the complaint. Appellee stated that those parts of the published article which were statements of fact were true, and that the statements unfavorable to appellant were taken from an official report made by the Governor of the state following an official investigation. The answer further asserted that the Gazette, as a publisher of news, was under a duty to publish contents of the report, and did so without malice or any desire to harm the plaintiff. "The said publication was

privileged and gives the plaintiff no basis for an action of libel. The said publication was also privileged as fair comment on a matter of public interest.'' After the filing of several motions, amendments, and taking of depositions, the cause proceeded to trial on May 9, 1961, and the jury returned a verdict for appellee. From the judgment so entered, appellant brings this appeal. Several grounds for reversal are asserted, but under the view that we take, it is not necessary that each be discussed.

A substantial portion of the contents of both briefs deals with the question of whether the Governor's statement was absolutely privileged. The issues in this litigation do not require a determination of that point, for the Governor is not a party, and a discussion of that question would, in our opinion, amount to nothing more than *dictum*. We therefore do not pass upon that matter. Here, we are only concerned with the privilege, if any, afforded the Arkansas Gazette in publishing the Governor's report. The trial court did not instruct the jury on absolute privilege; rather, the pertinent instruction was as follows:

''You are instructed that if you find from the evidence in this case that the Governor of the State of Arkansas in his official capacity and in carrying out the duties imposed upon him by law caused to be made an investigation into the operation of certain nursing homes in the State of Arkansas and on or about July 16, 1959, issued a press report based upon said investigation and further find that the defendant's publication of said press release in its issue of July 17, 1959, was an accurate and impartial account of said press release and was published in good faith and was not published with the intent to harm the plaintiff, then you are told said publication was privileged   *   *   *.''

This was a correct declaration of the law. In Restatement of the Law of Torts, Vol. 3, § 611, p. 293, we find:

''The publication of a report of judicial proceedings, or proceedings of a legislative or administrative

body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is

(a) accurate and complete or a fair abridgment of such proceedings, and

(b) not made solely for the purpose of causing harm to the person defamed."

The fact that the Governor's report was given to the press, rather than filed with an agency of the state government (where reporters could have copied the contents), is of no moment. It was still an executive report, embracing the findings of a thorough investigation. The purpose of affording a conditional privilege to the publication of the report of an executive officer, is based upon the fact that the general public has an interest in, and a right to be informed of, the official acts of such officers.

There seems to be no question but that the Governor was acting officially. The Governor himself testified that he caused the investigation to be made, after receiving reports of irregularities in the nursing homes. The State Police assisted in the investigation, and a comprehensive report was filed with the Chief Executive. According to the Governor, the report consisted of approximately a dozen volumes, containing photostats and statements; numerous witnesses were interviewed. The press conference was the result of the investigation made. Actually, the fact that the Governor was acting officially was recognized by appellant herself. On July 21, 1959, Mrs. Brandon, as Manager-Director of Trinity, verified a complaint against Governor Faubus seeking to enjoin him from causing welfare patients to be removed from Trinity. Mrs. Brandon stated that she read the complaint, and admitted verifying it. That complaint, *inter alia,* alleged:

"Plaintiff states that the defendant, Orval E. Faubus, acting in his *official capacity*[1] as Governor of the State of Arkansas, has made public statements of maltreatment of patients, including starvation, serving of spoiled and improper food, unsanitary conditions, negligence of the ill and bedfast and improper use of drugs that may have resulted in the death of patients being cared for in the nursing home operated by the plaintiff which is under the direct supervision of the Department of Welfare, State of Arkansas."

At any rate, the jury, under the instruction heretofore quoted, apparently found that the Governor was acting officially.

In *Tilles* v. *Pulitzer Publishing Co.*, 241 Mo. 609, 145 S. W. 1143, the Governor of Missouri ordered the Attorney General to investigate the operation of a race track. The latter, through his assistants, investigated, and made several reports to the Governor that the law was being violated. After the investigation, the Attorney General gave defendant's correspondent an interview in which he stated, speaking as Attorney General, and in order to inform the public concerning what he considered a matter of public interest, that the owners of the race track were guilty of a felony. Both the Governor and the Attorney General threatened action against such owners. A libel suit was instituted against Pulitzer, as publisher of the St. Louis Post-Dispatch. In holding for the publisher, the Supreme Court of Missouri said:

"The reason for such threatened action the public was entitled to know, to the end that those who did not desire to be present when wholesale arrests were made, or the militia was called into service, might keep away from the place. The Attorney General in the close of his testimony said that he was speaking officially, and intended that his opinion should be made public, on account of the public interest which was to be subserved. He was, in fact, expressing his opinion as to the condition and legal status of the Delmar Jockey Club and the acts of such club and of its owners.

---

[1] Emphasis supplied.

Under these circumstances, we think that there was a privilege or at least a qualified privilege in the publication of the article containing this opinion of the chief law officer of the state.''

The report of the Gazette appears to have been accurately and fairly made. Governor Faubus testified that he recalled making all statements attributed to him in the Gazette article except one. ''I do not recall the statement about Mrs. Brandon being astounded when confronted with the report which we had compiled. This is not to say that it isn't true or that it did not happen, but I don't happen to recall that particular one, but I recall the others.''[2] The text of the Governor's statement was published in the July 17th issue of the Gazette. The front page article is headed, ''Faubus Says Probe Uncovers Scandal at Nursing Home.'' The subhead to the reader's right reads, ''Shocking Conditions Are Alleged.'' This column was written by the Gazette reporter who covered the press conference, and it is mentioned that the charges were denied by appellant. To the reader's left appears a subhead of equal size, ''Trinity Denies Charges, Asks Probe by Jury.'' This story was written by Mr. Patrick Owens, heretofore referred to in paragraph one, and was based on his visit to the home and interview with Mrs. Brandon. This column sets out in full the denials of Mrs. Brandon and her attorney to each charge made, and in addition, quotes a statement from the Chief Sanitarian of the Little Rock Health Department, ''To the best of my knowledge, we've had no unusual trouble up there.'' The article also mentions that Ivan H. Smith, attorney for the Welfare Department, had praised the services rendered by Mrs. Brandon in handling court actions relating to enforcement of support in bastardy proceedings, and enforcement of orders of support from the Chancery Court. The story by Mr. Owens seems to be completely fair, and to adequately cover Mrs. Brandon's denials. There is no con-

---

[2] Of course, there is nothing libelous in reporting that one was ''astounded'' when accused of improper conduct.

tention, nor proof, that the publication was made solely for the purpose of causing harm to Mrs. Brandon.

Appellant cannot prevail in this litigation for yet another reason, *i. e.*, there was consent to the publication of the article sued upon. Mrs. Brandon testified that Mr. Owens was invited to interview her at the home. According to appellant, she "wanted them to come out and look at the home and see it was not true." The visit was arranged after the evening paper carried the Governor's press release. It would appear from her testimony, that Mrs. Brandon wanted the Gazette to print her side of the controversy without printing the charges that had been made,[3] but we find it difficult to understand how one's denials to charges made can be published without also publishing the charges. There was testimony by the publisher of the Gazette that on July 17th, the day of the publication, Mrs. Brandon called to express gratitude and pleasure at the manner in which the Gazette had handled the story. Mr. Owens likewise testified that Mrs. Brandon later discussed with him the manner in which the Gazette had handled the story, and she was pleased. The court instructed the jury:

"If you find that on July 16, 1959, the Arkansas Democrat, a local paper, published a copy of the report released by the Governor of the State of Arkansas on July 16, 1959; that the representatives of the defendant called on the plaintiff and she consented, impliedly, either in person or acting through a duly authorized representative, that the defendant could publish said report made by the Governor of the State of Arkansas upon condition that at the same time it publish her denial of the contents and set forth her side of the issues raised by said report; that the defendant in good faith published her denial of the contents of said report and her version of the issues raised by said report, then the Court instructs you to return a verdict for the defendant."

_____

[3] Mr. Owens testified there was no request that the Governor's press release not be printed.

This was a correct statement of the law, and the jury would certainly have been justified in finding that for Mrs. Brandon's denial to make sense, it was necessary to print the charges, and she therefore impliedly consented to the entire publication.

Judgment affirmed.