KARK-TV *v.* Andre SIMON and Barry SMITH

83-47                                    656 S.W.2d 702

Supreme Court of Arkansas
Opinion delivered September 12, 1983

*Owens, McHaney & Calhoun*, by: *James M. McHaney, Sr.* and *James M. McHaney, Jr.;* and *Baker & Hostetler*, by: *Bruce W. Sanford* and *Lee Levine*, for appellant.

*Kaplan, Hollingsworth & Brewer, P.A.*, by: *Peter A. Miller*, for appellees.

STEELE HAYS, Justice. This defamation case was brought by Andre Simon and Barry Smith, appellees, against KARK-TV of Little Rock, appellant. On the evening of August 11, 1982, while Smith and Simon were shopping in a store at the Galleria Shopping Center, the police received a call that the store was being robbed by two men. At about 8:30 p.m., eight policemen converged on the scene. They handcuffed and searched the appellees and placed them in a squad car. Carolyn Long, a reporter for KARK-TV, happened to be in another business establishment two doors down. Information was relayed to her from someone who was listening to the police scanner that there was a potential robbery situation. Long met the camera crew that had been sent by the station and had the incident filmed. She questioned the police but got no comment from them. She then interviewed a clerk in the store from whom she got only some vague responses. The newsteam then left the scene. At 9:00 p.m., or shortly after, appellees were released when the officers decided that the caller was mistaken and no crime was in the making. The following report was broadcast on the ten o'clock news:

> Quick action by Little Rock Police tonight stopped a robbery attempt at Custom Design at the Galleria Shopping Center. Details are sketchy, however it appears two suspects backed their car up to the store in order to rob it. For a time, the two men allegedly held a store clerk hostage. The clerk was shaken, and wasn't sure about exactly what had happened.

The appellees were not named, but the newscast included scenes of the police placing the appellees in a squad car. It was stipulated the newscast was viewed by 82,000[1] households. After trial the court entered judgment on a jury verdict against KARK awarding the appellees $12,500 each as compensatory damages. On appeal, we reverse and remand.

Appellants argue they were entitled to judgment as a matter of law because the news report was substantially

---

[1] An estimated 160,000 people.

accurate and was privileged. While we have recognized these concepts generally,[2] we cannot say that under the facts in this case the news report as a matter of law was substantially accurate or that the matter was privileged. In *Pritchard* v. *Times Southwest Broadcasting,* 277 Ark. 458, 642 S.W.2d 877 (1982), quoting Prosser,[3] we stated that literal truth was not necessary, that substantial truth will suffice. In *Pritchard,* we found that the gist or the "sting" of the defendant's remarks was in essence true, although there were some minor conflicts in what was alleged. In contrast, the substance of this news story contained no truth at all. There was simply no robbery attempt and the appellants were in no way involved in any crime.

Appellants contend that they are given a common-law privilege under § 611 (h) of the Restatement of Torts, to report the fact of an arrest. However, we question the applicability of that section. There was no arrest in this case, appellees were only detained during a brief investigation. And whether this action by the police would be considered "official action" within § 611 (h) appears to be a new and unsettled question. See *Medico* v. *Time,* 509 F. Supp. 268 (E.D. Pa. 1980). But the privilege granted in § 611 is qualified and will be lost if abused by failure to give an accurate and fair report under § 611 (f). The report need not be *precisely* correct, as long as it is *substantially* correct. Appellant cites *Williams* v. *WCAU-TV,* 555 F. Supp. 198 (1983), where the broadcaster was granted summary judgment on the grounds that the broadcast was a fair and accurate report of official police action and the reports were substantially correct. There a neighborhood bank had been held up and the police arrested Williams, believing he was one of the three individuals involved. (The police subsequently established, before the newscast, that the plaintiff was not involved.) It was undisputed however that all of the facts in the broadcast were accurately reported. Here there was no robbery attempt, the appellees had not backed up

---

[2]*Pritchard* v. *Times Southwest Broadcasting,* 277 Ark. 458, 642 S.W.2d 877 (1982), substantial truth; *Brandon* v. *Gazette Publishing Co.,* 234 Ark. 332, 352 S.W.2d 92 (1961), privilege.

[3]Prosser, *Handbook of the Law of Torts,* p. 798-799 (4th ed. 1971).

their car to the store to rob (they had merely backed into a space). The clerk was never held as a hostage. Under these circumstances, if there was a privilege, we would have to find that it was lost.

Appellants also urge that the negligence instructions were improper and that in any case, the appellants were not negligent. The court instructed the jury on ordinary negligence and appellants contend that the proper instructions should have been the standard of a reasonably careful *broadcaster* in the community. We indicated in *Dodrill* v. *Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979) that within the latitude accorded in *Gertz* v. *Robert Welch*, 418 U.S. 323 (1974) in the case of a private individual, the ordinary negligence standard would measure the publisher's liability. The court instructed the jury here that the defendant was held to the standard of care a reasonably careful person would exercise under circumstances similar to those shown by the evidence. Nothing suggests that the appellant was prevented from showing what the standard in the industry is and such proof would be evidence the jury could use in making their determination of whether there was a breach of the duty owed.[4]

Nor can we say as a matter of law that appellant was not negligent. We are thoroughly satisfied there was a sufficient basis to submit that issue to the jury. The initial information about a robbery in progress and possible hostage situation was relayed to the television station by way of reports heard on a police scanner. That information was put together with a reporter's eyewitness account of the police taking the appellees into custody. The reporter could get no information from the officers at the scene nor could the producer of the news get any information verified by police headquarters. The story was written and shown a little over an hour later. We cannot say that a news report with its sources

[4]We also note that an apparent majority of jurisdictions have adopted the negligence standard in "private individual" suits. See: *Miami Herald Publishing Co.* v. *Ane*, 423 So.2d 376, 385 n. 3 (Fla. Dist. Ct. App. 1983); *Living with Gertz: A Practical Look at Constitutional Libel Standards*, 67 Virginia Law Review 287, 288 n. 13 (1981); *Mathis* v. *Philadelphia Newspapers, Inc.*, 455 F. Supp. 406, n. 2 (E.D. Pa. 1978).

consisting of information from a police scanner, uncorroborated by police on the scene, in conjunction with an eyewitness account by a news reporter who did not know the surrounding circumstances of what she observed, will be found to be due care as a matter of law. We think the issue of negligence was properly submitted to the jury.

Appellant further argues that it is entitled to reversal as a matter of law because the appellees failed to demonstrate that they sustained a legally compensable injury as a proximate result of the news report. The appellant makes two points: first, that under *Gertz*, the court erred in not instructing the jury that the damages awarded must be for actual injury incurred. However, *Gertz* does not require such an instruction. The Supreme Court pointed out it would not define "actual injury," but said it was not limited to out-of-pocket expenses and could include personal humiliation and mental anguish. *Gertz* does eliminate presumed damages and holds that damages must be proved by competent evidence. In the instructions this jury was told the appellees did have the burden of proving that they sustained damages. Such instructions clearly indicate that damages could not be presumed. Appellant's second point, that no legally compensable injury was sustained, we cannot uphold. Addressing the question of constitutional limitations on the recovery of general damages, posed by the *Gertz* decision, Rest. 2d of Torts § 621 (b), states:

> The court has not specifically defined actual injury, but it has explained that the term is not confined to out-of-pocket loss. It includes "impairment of reputation and standing in the community," but this must be supported by competent evidence and cannot be presumed in the absence of proof. Unless the harm is pecuniary in nature, the evidence need not "assign an actual dollar value" to it. "Actual injury" is also held to include "personal humiliation, and mental anguish and suffering," provided they are proved to have been sustained. The Constitution does not require proof of impairment of reputation before damages for emotional distress can be recovered.

Here, the appellees presented testimony of witnesses, giving their response to the broadcast, as well as the appellees' own reactions to the broadcast. We think there was competent evidence presented to the jury on this question.

As their last point, appellants argue that the award of compensatory damages must be vacated and a new trial ordered. In *Gertz* it was held that an award of punitive damages could only be made where it was proven with convincing clarity that the defendant broadcast the story with "actual malice". We reiterate that holding in *Dodrill*, that punitive damages are precluded except for the showing of knowledge of falsity or a reckless disregard for the truth. Because we find the record devoid of evidence of a clear and convincing nature that the defendant acted with "actual malice," or with sufficient recklessness, it was therefore error to submit the issue of punitive damages to the jury. The jury's refusal to award punitive damages would ordinarily render the error harmless, but appellees were permitted to present evidence of the appellant's net worth. We have held on a number of occasions that where the issue of punitive damages is erroneously submitted to the jury, together with the defendant's financial condition, an award of compensatory damages is tainted and cannot stand. *Dalrymple* v. *Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982); *Life and Casualty Insurance Co.* v. *Padgett,* 241 Ark. 353, 407 S.W.2d 728 (1966). The case is reversed and remanded for further proceedings consistent with this opinion.

DUDLEY, J., concurs.

PURTLE, J., dissents.

ROBERT H. DUDLEY, Justice, concurring. The plaintiffs, who are two private individuals, proved that the defendant publisher did not exercise ordinary care in the redaction of the statement and the editing of the videofilm and, as a result, they were defamed by the false broadcast. The plaintiffs did not prove that the defendant acted with actual malice toward them. Consequently, the defendant was liable for compensatory, or actual, damages suffered by the plaintiffs but was not liable for punitive, or punishment,

damages. Even so, on the ground of proof of punitive damages, the defamed plaintiffs were allowed to prove that the broadcaster had a net worth of five and one-half million dollars. Proof of a journalist's net worth under such a rationale invites a jury to punish a journalist for the publication of unpopular opinion rather than to compensate the defamed person for the injury sustained by the publishing of the falsehood.

The meaningful issue in this case is the antithesis between the law of defamation and the freedoms of speech and press in a self-governing society. After analyzing the competing concerns, it is my conclusion that our substantive law is constitutionally established. Within that substantive law there can be an undesirable result. It may occur when the publisher, at the time of publication of the statement, had no knowledge of what was or was not sufficient care to protect himself from liability in the event of error and then, at trial, the ultimate falsity of the statement is proven. Liability at that time and self-censorship in the future by the publisher are the result. Unwanted self-censorship constitutes a threat of expression of unpopular opinion. I write separately to suggest that, upon being presented the proper case, we adopt an exclusionary rule of evidence which will provide a procedural law safeguard against the foregoing threat.

In our dual system of government we are subject to the law of two governmental regimes. Both provide for the freedoms of speech and press. However, redress for injury by defamation is provided only by state law. It has no federal counterpart.

The Constitution of Arkansas provides for redress for injury to one's reputation and, prior to 1964, our law of defamation was not held to conflict with the protections of the First Amendment of the federal constitution. Certain classes of falsehoods were regarded as defamatory per se and damage to the victim was presumed from the mere act of publication. *Dunagan* v. *Upham*, 214 Ark. 66, 214 S.W.2d 786 (1946). Our common law providing for strict liability, or liability without regard to fault, was modified in 1964 by the

federal regime when the Supreme Court of the United States ruled that the state laws of defamation could be exercised only in concert with the federally guaranteed freedoms of speech and press. In that decision, *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), the Supreme Court addressed the need for a vigorous and uninhibited press balanced by the legitimate interest of redressing wrongful injury by defamation. The conclusion was that a rule of strict liability unduly inhibited the press when applied to defamation suits by public officials. A fault standard of actual malice was required in place of strict liability. In accordance with that decision a journalist in any state is now protected from liability in the event a false statement is made about a public official unless the journalist is guilty of actual malice. The two principal factors considered in *New York Times* were the need to protect the free exchange of ideas so that political and social change desired by the self-governing public could be brought about and the fear that the law of libel as applied by many states, such as ours, would lead to self-censorship. "Self-censorship" has two meanings. In its descriptive sense, "self-censorship" occurs whenever a journalist refrains from publishing material for legal reasons. *See* Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422, 430-31 (1975). Sometimes it is intended to curtail speech injurious to other values, such as obscenity standards. This type of self-censorship may be acceptable. However, if it refers to a needless restraint on the freedom of expression in the name of some competing value, and is more inhibitory than is necessary, it is unconstitutional. *See* Roth, *In Defense of Fault in Defamation Law*, 88 Yale Law Journal 1735 (1979).

In the years following the *New York Times* decision, the term "public official" was extended to "public figure." *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 (1967) and *Associated Press* v. *Walker*, 388 U.S. 130 (1967). However, none of these cases established a constitutionally mandated standard of fault in event the false statement is about a private individual.

A short-lived deviation in doctrine occurred six years later when a three-member plurality of the Supreme Court, with five opinions among the eight participating jurists,

shifted the focus away from the status of the person defamed and to the nature of the event in which the defamation had occurred. *Rosenbloom* v. *Metromedia,* 403 U.S. 29 (1971). The plurality held that the press protection should extend to defamatory falsehoods relating to private persons if the statements concerned matters of general public interest.

In a case handed down three months prior to *Rosenbloom,* but at a time when a lower federal court had extended the *New York Times* doctrine to encompass private individuals involved in matters of important public concern, this court refused to apply the *Rosenbloom* philosophy. *Jones* v. *Commercial Printing Co.,* 249 Ark. 952, 463 S.W.2d 92 (1971). After *Rosenbloom* we stated that we "must" hold that matters of public concern were within the press protection of the First Amendment but, independent of the federal dictates, we did not adopt the *Rosenbloom* philosophy. *Gallman* v. *Carnes,* 254 Ark. 987, 497 S.W.2d 47 (1973).

In 1974 the Supreme Court rejected the *Rosenbloom* doctrine and, once again, emphasized the individual injured rather than the event reported. *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974). There were two principal reasons for the repudiation. First, the majority felt that unpopular speech is threatened when the content of the statement is the determining factor in liability. The First Amendment is content-neutral and, accordingly, the content-based standard was rejected because it involved the danger of determining "what information is relevant to self-government." Secondly, the majority felt that it was undesirable to virtually eliminate the ability of the states to protect defamation victims.

In *Gertz,* the Supreme Court adopted alternative definitions of "public figure." The first branch of the definition includes those "who occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." The second encompasses those who "have thrust themselves on the forefront of particular public controversies in order to influence the resolution of the issues resolved." All others are private individuals. *See Wolston* v. *Readers Digest Association, Inc.,* 443 U.S. 157

(1979), *Hutchinson* v. *Proxmire,* 443 U.S. 111 (1979) and *Time, Inc.* v. *Firestone,* 424 U.S. 448 (1976).

The Supreme Court in *Gertz* held that the First Amendment protection was satisfied, in the case of a private individual, so long as liability is not imposed without fault. Thus, the individual states must set the standard of fault for liability of a journalist charged with defamation of private persons.

Since *Gertz,* a majority of the states adopting a standard of negligence for cases where a private person is defamed have adopted the "ordinary negligence" standard. Collins & Drushal, *The Reaction of the State Courts to Gertz v. Robert Welch, Inc.,* 28 Case W. Res. L. Rev. 306, 313-314 (1978). The rationales for adopting the ordinary standard fall into four common themes. The first, and most common theme, is that "reputational interests command constitutional protection." The second is that nothing in the state law requires a stricter standard. The third line of reasoning is that the private person who had been defamed should be allowed recovery as easily as constitutionally permissible. The fourth theme is that press can be demagogic and ought not be given additional power. A minority of states, five, have reached contra holdings.

This court, in the case now before us, has no leeway in setting the standard of fault for Arkansas. In *Dodrill* v. *Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied* 444 U.S. 1076 (1980), we followed *Gertz* and acknowledged the repudiation of the *Rosenbloom* content-based doctrine. In reversing and remanding the case we instructed the trial court that, upon retrial, the standard of fault was as follows:

The publisher of a libelous article shall be liable to the defamed private individual for failure to exercise ordinary care.

Although not expressed, the reasoning for the ruling is that, like the majority of the states, the Constitution of Arkansas commands protection of the reputational interest.

It recognizes the "inherent and inalienable rights" of "acquiring, possessing and protecting property and reputation . . . " Ark. Const. art. II, § 2. It also mandates that an individual is entitled to a remedy "for all injuries or wrongs he may receive in his person, property or character." Ark. Const. art. II, § 13. Each of our constitutions has contained a provision for freedom of expression and each has also specifically recognized the interest of the individual in the protection of his reputation. The present constitution provides in art. II, § 6:

> The liberty of the press shall forever remain inviolate. The communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, *being responsible for the abuse of such right.* [Emphasis added.]

Our four prior constitutions also contained the phrase "being responsible for the abuse of such right." Ark. Const. art. II, § 7, 1864, 1861, and 1836; Ark. Const. art. I, § 2, 1868. Thus, from the outset of this state, the constitutionally recognized right of the individual to his reputation is not to be limited as a means of protecting freedom of the press.

Unlike our state constitution, the First Amendment of the Constitution of the United States contains no defamation clause but the Supreme Court of the United States has determined that a standard of liability less protective to the press than that of actual malice will not impermissibly abridge the First Amendment freedoms in cases involving private individuals. The federal ruling is determinative of the freedom of expression provisions of both constitutions but not the responsibility provision of our state constitution. *See Wilson* v. *City of Pine Bluff,* 278 Ark. 65, 643 S.W.2d 569 (1982). Thus, our state constitution mandates and the federal constitution accommodates the standard of fault being ordinary negligence in the event the person defamed is a private individual.

In the case at bar it is argued that, even if the standard is "ordinary negligence," it should be measured by what a

reasonably careful broadcaster in the community would or would not publish. Such a measure would cause uncertainty and ultimately induce more self-censorship. First, the concept of one legal measure for the negligence of a broadcaster, another for a newspaperman, and yet another for an ordinary individual is contra to the spirit of our constitutional provision. No logical distinction can be made between a spoken statement and a written statement. Of course, in determining what a reasonably careful person would or would not do, proof is admissible as to the generally accepted standard of professional journalistic conduct. Secondly, the concept of a local standard is not in spirit with the concept of one constitution for all of the state. Most importantly, these concepts would leave a publisher without any definitive means of ensuring freedom from liability by tailoring his conduct to meet a particular requirement. Unwanted self-censoring would be the inevitable result.

Similarly, there is no leeway in determining the standard for the degree of proof of negligence. In *Rosenbloom*, the plurality held that the proof of actual malice must be made "with convincing clarity," a standard more protective of the freedoms of speech and press than the usual "preponderance of the evidence." However, *Gertz* leaves it to the states to set the standard and, again, the state constitution mandates the answer.

In summary, a publisher has a privilege to print or state a falsehood about a public figure, so long as it is not done with actual malice. That same privilege does not apply if the person defamed is a private individual. There, liability may be imposed by standards set by the individual states so long as the standard is not strict liability. The standard imposed in Arkansas is proof by a preponderance of the evidence of ordinary negligence. Such a standard tends, in practice, to hold a publisher liable for factors outside his control whereby he cannot be certain that, when an article is ultimately proven erroneous, his efforts to insure accuracy will be deemed sufficient. The publisher's lack of control is due to two factors: (1) nebulous standard of due care. A speaker "steers clear of a barbed wire fence, but he stays even

farther away if he is not sure exactly where the fence is." Wright, *Defamation, Privacy, and the Public's Right To Know: A National Problem and a New Approach*, 46 Tex. L. Rev. 630, 634 (1968), and (2) the fact that proof of ultimate falsity is permitted which may cause an inordinate influence on the evaluation of whether due care was exercised. As a result, unwarranted self-censorship will still take place and that, in turn, is a threat to unpopular expression.

A proposal first mentioned in Roth, *In Defense of Fault in Defamation Law*, 88 Yale L. Jour. 1735, 1747-49 (1978) would help alleviate the threat to unpopular speech. The proposal would limit the admissibility of evidence in a defamation suit to that which was within the reach of the journalist when the defamatory statement was prepared. The limitation would be accomplished by an exclusionary rule of evidence. The proposal is as follows:

> The rules governing admissibility in a defamation proceeding should exclude all evidence that a plaintiff refused to disclose to the defendant in response to detailed defamatory charges and that was not otherwise reasonably available at the time of publication. Under this rule, a journalist would be responsible for considering all information reasonably obtainable when he prepared the article. But the rule would shield him from accountability for information that the subject of an article refused to disclose and that the journalist could not reasonably have acquired elsewhere.

> Application of this exclusionary rule should depend on two conditions. First, it should be triggered only if the journalist has presented to the subject the contents of an injurious charge and requested relevant information within the subject's exclusive control. The subject would thus be put on notice that, if he fails to cooperate, his legal remedies for defamation might be impaired. Second, the subject should be required to respond with no greater factual specificity than that with which the charges were presented. The journalist would thus be prevented from exploiting the rule to conduct a fishing expedition. The rule would function

meaningfully only if the original accusations were made in considerable detail. Assuming such factual specificity in the journalist's accusations, neither a statement of "no comment" nor broad, conclusory denials would reserve a subject's right to introduce underlying facts at a defamation proceeding. [Emphasis added.[

The proposed rule would accommodate the action for defamation with a minimum restriction on free speech. It would provide the publisher with clear choices to follow, each of which would result in freedom from liability. First, if after seeing the content of the statement, the individual acknowledges the truth of the statement there is freedom from liability and no need to do anything more. Second, if the individual simply gives a "no comment," the evidence of falsity of the statement which is peculiarly within his knowledge would be excluded at a trial, and to avoid liability the publisher would be required to show only that a reasonably careful effort was made to acquire the information elsewhere. Third, if the private individual gave a meaningful denial, the publisher would know that he must make a meticulous and thorough investigation and be absolutely certain of the truth of his statement and the falsity of the denial or else liability would attach. Most importantly, the publisher would know how to tailor his work to meet the specific requirement.

Other beneficial aspects of the proposed rule are that it would provide a method of self-help for the individual and lead to the resolution of many defamatory statements. When presented the proper set of facts, I intend to vote in favor of the proposed exclusionary rule.

JOHN I. PURTLE, Justice, dissenting. It seems to me the majority opinion holds that a person, firm or corporation cannot be held liable for libel unless it is first proved that the publication or broadcast was not done with the specific intent of injuring the victim. I cannot agree with such a holding. All of the cases cited have held that when a matter was published with "actual malice" or "reckless disregard for the truth" punitive damages were allowable. In my

opinion the majority has now overruled a long established principle of law and made it almost impossible to recover punitive damages in a libel suit.

The facts, as stated in the majority opinion, show conclusively that the story presented by the appellant was devoid of truth. There was no robbery attempt; there was no hostage; there were no arrests; and the police did not prevent a robbery. Everything in the report was untrue and unverified by the appellant. If this does not amount to a reckless disregard for the truth then it is difficult to imagine a case where this standard would exist.

Cases cited in the opinion were ones where there were more than one defendant; here there is only one defendant. There was no prejudice to any other defendants such as occurred in *Life & Casualty Ins. Co. v. Padgett*, 241 Ark. 353, 407 S.W.2d 728 (1966) and *Dalrymple v. Fields*, 276 Ark. 185, 633 S.W.2d 362 (1982). In the present case, the entire matter was properly presented to the jury.

Had the newscast not shown the appellees as the subjects of the telecast the damages might not have existed. However, appellees were clearly identified as two would-be robbers and kidnappers. This story was completely false. Without this telecast, few, if any, of appellees' friends and acquaintances would have even heard of their brief detention by the police.

The First Amendment right of free speech and free press carries with it some responsibility. There is no freedom to falsely shout "fire" in a crowded theater. *Schenck* v. *U.S.*, 249 U.S. 47 (1919). Nor is there the freedom to injure innocent people through the broadcast of their faces on a widely viewed newscast when the facts in the story are unconfirmed, false and show an utter disregard for standards within the news reporting profession to an extent that is easily recognizable as reckless. A jury of twelve properly found that this was the case and subsequently awarded compensatory damages to appellees. To abrogate the prior law on this subject is to do a considerable disservice to all residents of this court's jurisdiction, each of whom is now a

potential victim of irresponsible journalism. This does an even greater disservice to the news media itself, for without the reasonable constraints provided for under our previous law, the temptation will be ever present to be less diligent in efforts to confirm the truthfulness of a newsmaking story. Freedom of the press may be abused and I sincerely believe it was in this case. At least the issue of whether the story was broadcast with "actual malice" or "reckless disregard for the truth" was a matter properly presented to the jury. Finding no other errors, I would affirm the trial court.