Brad BUTLER *v.* HEARST-ARGYLE TELEVISION, INC.; Arkansas Hearst-Argyle Television, Inc.; and Rhonda Justice

01-126                                              49 S.W.3d 116

Supreme Court of Arkansas
Opinion delivered July 9, 2001

*The Mulkey Attorneys Group, P.A.*, by: *Bruce L. Mulkey*, for appellant.

*Warner, Smith & Harris, PLC*, by: *G. Alan Wooten, James M. Dunn*, and *Matthew C. Carter*, for appellees.

W.H. "DUB" ARNOLD, Chief Justice. Appellant, Brad Butler, brings the instant appeal challenging the Benton County Circuit Court's order granting summary judgment in favor of appellees, Hearst–Argyle Television, Inc., its Arkansas affiliate, KHBS/KHOG–TV, and one of its reporters, Rhonda Justice. Butler, a former Benton County prosecuting attorney, complained that appellees committed the torts of defamation, invasion of privacy, and outrage by broadcasting portions of Benton County inmate Stephanie Roberts's videotaped affidavit alleging a sexual relationship with Butler. The Court of Appeals certified this first-impression case for us to consider whether the "fair-report privilege" shields appellees from liability under the instant facts. Our jurisdiction is authorized pursuant to Ark. R. Sup. Ct. 1–2(d) and 1–2(b)(1) and (6) (2000).

## Background

Butler sued appellees on September 28, 1999, after KHOG-TV aired a report containing clips from Stephanie Roberts's video-taped affidavit, detailing her alleged sexual relationship with Butler. In particular, Roberts claimed that she had sexual intercourse with Butler in his office during a time when she was being prosecuted by the prosecutor's office. According to Butler, he first met Roberts when she offered to wear a wire while sharing a jail cell with Brandi Orman, a murder suspect. The prosecutor's office utilized Roberts as an informant in a number of cases. Roberts was ultimately released on probation, subject to home detention and monitoring. Then, in late January 1999, Roberts told Butler that she was being sexually harassed by members of the Benton County Sheriff's Department. Although Butler never confirmed Roberts's allegations, he acknowledged that he investigated the complaint, took recorded statements from Roberts, and reviewed jail files.

On June 2, 1999, Roberts cut off her ankle-monitoring device and held herself at gunpoint inside a home in Bella Vista. According to witnesses, Roberts demanded to speak with Butler. Authorities eventually disarmed Roberts but allowed her to remain in the home until Butler arrived. Roberts explained that she wanted to tell Butler that she had miscarried his baby. KHOG-TV reporter Rhonda Justice, who had previously met with Butler about Roberts's sexual-harassment allegations against the jailers, observed the "strange treatment" Roberts received during the stand-off and decided to visit her in the Benton County Jail later that evening. During their meeting, Roberts reported that she had miscarried Butler's baby. Justice met with Roberts again, a few days later, and also visited with her by telephone several times. During these interviews, Roberts admitted that she had numerous sexual encounters with Butler in his office and once in his Suburban while parked in front of her mother's home.

In light of Roberts's remarks, her attorneys questioned Butler about the allegations, which Butler denied. Her attorneys also informed Butler that he had "twenty-four hours to resign or else." In response, Butler filed a motion to voluntarily recuse from prosecuting Roberts's case. Roberts's attorneys then filed a cross-motion seeking Butler's recusal and the appointment of a special prosecutor. As an exhibit to the motion, Roberts's attorneys attached her videotaped affidavit detailing four alleged incidents of sexual intercourse with Butler, including three encounters in the prosecutor's

office and one in his vehicle. She also discussed the events surrounding her stand-off with the police. Notably, Roberts explained that she made the affidavit in response to Rhonda Justice's claim that she had pictures of Butler and Roberts and planned to release them.

On July 2, 1999, KHOG-TV broadcast a report stating that Butler had been asked to recuse from Roberts's case because of allegations that " . . . Butler and Roberts had . . . an inappropriate sexual relationship while Roberts was on probation for check forgery. Attorneys also provided a video affidavit in which Roberts says she had sex with Butler on four occasions." The video clip contained Roberts's statement, "I mean, to be blunt, we had sex in his office." The televised report also indicated that Butler called the allegations false, that he welcomed the appointment of a special prosecutor, and was "confident that there will be no evidence of criminal wrongdoing by him or his office."

Special Prosecutor John Everett issued a report on December 1, 1999, concluding that, while there had been no criminal conduct involved, Butler and Roberts were certainly engaged in a relationship characterized as "unprofessional, far outside the ordinary, [and] reflected adversely on the Prosecuting Attorney's Office, the criminal justice system in Benton County, the legal profession, and Brad Butler himself." Everett's report also noted that the relationship involved numerous late-night phone calls from Butler to Roberts, Butler's intervention in some of Roberts's criminal cases and probation matters, and Roberts's knowledge of matters about Butler "which would not normally be known by a defendant in a criminal case," including the location of a scar on Butler's stomach and Butler's very new home address and phone number. Finally, Everett observed that Butler's response to the allegations was "non-committal" and "less than convincing as a denial and could be construed as a tacit admission." A footnote to the report addressed the existence of the rumored pictures but explained that "no such photographs have been found and [Everett] believe[d] that none exist."

For his part, Butler complained that Rhonda Justice "precipitate[d] Roberts' actions and . . . influence[d] Roberts' allegations against Butler . . . [and] intentionally manufactured the news story about Butler and Roberts as there [was] no sexual contact between Butler and Roberts." Although he conceded that the "fair-report privilege" protects the publication of statements made during a judicial proceeding if the report is fair, accurate, and complete, Butler asserted that KHOG-TV's report was not privileged because

it was not fair, accurate, or impartial. Along those lines, Butler averred that appellees knew that Roberts's allegation that Justice had pictures was important to the story but delayed reporting that fact for twelve days following its initial report. Butler further reasoned that appellees should not be entitled to the privilege because they were "involved in promulgating the story, and Justice had knowledge of the likely falsity of the allegations behind the story."

Appellees responded to Butler's lawsuit by filing a motion for summary judgment, attaching Special Prosecutor Everett's report as an exhibit and asserting the fair-report privilege. Based on the pleadings and exhibits, the trial court granted appellees' motion for summary judgment. From that order, Butler filed the instant appeal challenging the application of the fair-report privilege to appellees. Specifically, appellant argues that the privilege does not apply "when the defamatory statement results from elicitation and coercion" and when the report was not fair, truthful, or accurate. We find no merit in appellant's arguments, and we affirm the trial court's grant of summary judgment.

## I. Fair-report privilege

█ Appellant first argues that the fair-report privilege does not protect appellees because the televised report was not a fair and substantially true account of official court proceedings. Because the First Amendment is involved in this case, we are "obligated to make an independent examination of the whole record to make sure the judgment does not constitute a forbidden intrusion on the field of free expression." *Southall v. Little Rock Newspapers, Inc.*, 332 Ark. 123, 133-34, 964 S.W.2d 187, 193 (1998) (citing *Fuller v. Russell*, 311 Ark. 108, 112, 842 S.W.2d 12, 14 (1992) (citing *Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485 (1984))). Similarly, where the appellees' First Amendment right to free expression is at stake, we apply a heightened standard of review. *Southall*, 332 Ark. at 134, 964 S.W.2d at 193.

█ █ The fair-report privilege is defined in the *Restatement (Second) of Torts* § 611 (1977), captioned "Report of Official Proceeding or Public Meeting." Section 611 provides that:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if

the report is accurate and complete or a fair abridgment of the occurrence reported.

According to the comments to section 611, the basis of the privilege is the "interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." *Id.*, cmt. *a.* Significantly, the privilege exists "even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false. Abuse of the privilege takes place, therefore, when the publisher does not give a fair and accurate report of the proceeding." *Id.*

■■ With regard to the accuracy and fairness of the report, it is enough that it conveys a substantially correct account of the proceedings. *Id.*, cmt. *f.* Furthermore, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression. *Id.* The privilege does not apply where a person testifies in a proceeding solely for the purpose of obtaining the fair-report shield for himself or in collusion with a third party. *Id.*, cmt. *c.*

This court has addressed the fair-report privilege under the *Restatement (Second) of Torts* in one other case.[1] In *KARK-TV v. Simon*, 280 Ark. 228, 656 S.W.2d 702 (1983), the appellant argued that it was entitled under § 611, cmt. *h*, of the *Restatement (Second) of Torts*, to report the fact of an arrest. We declined to apply the privilege in that case because "the substance of the news story contained no truth at all." Indeed, there had been no robbery attempt or arrest. *Id.*, 280 Ark. at 231, 656 S.W.2d at 703. In so doing, we recognized that the privilege granted under § 611 can be lost "if abused by failure to give an accurate and fair report under [comment *f*]," but also noted that "[t]he report need not be *precisely* correct, as long as it is *substantially* correct." *Id.*, 280 Ark. at 231, 656 S.W.2d at 704.

■ Furthermore, in testing the accuracy of the reporting under the fair-report privilege, this court applied the "substantial truth" doctrine previously recognized in *Pritchard v. Times Southwest Broadcasting, Inc.*, 277 Ark. 458, 642 S.W.2d 877 (1982) (citing *Prosser,*

---

[1] The fair-report privilege as defined in section 611 of the first *Restatement of the Law of Torts* was previously addressed by this court in *Brandon v. Gazette Publishing Co.*, 234 Ark. 332, 352 S.W.2d 92 (1961), and *Jones v. Commercial Printing Co.*, 249 Ark. 952, 463 S.W.2d 92 (1971).

*Handbook of the Law of Torts,* 798-99 (4th ed. 1971)). *Id.* Under that doctrine, the literal truth is not necessary and substantial truth, sometimes referred to as the "gist" or the "sting," will suffice. *Id.* In other words, under the fair-report privilege, the gist or the "sting" of an official action or proceeding must be accurately conveyed in the report.

Other jurisdictions have used a similar standard in the context of the fair-report privilege to test the accuracy of the reporting. *See First Lehigh Bank v. Cowen,* 700 A.2d 498, 503 (Sup. Ct. Pa. 1997) ("The question of whether the fair report privilege has been abused has been distilled by the federal court to a 'gist' or 'sting' test. 'A statement is substantially accurate if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.' "); *Dorsey v. National Enquirer, Inc.,* 973 F.2d 1431, 1436 (9th Cir. 1992); *Williams v. WCAU-TV,* 555 F. Supp. 198, 202 (E.D. Pa. 1983).

The original Restatement applied the privilege if it was an "accurate and complete or fair abridgment of such proceedings," but the privilege could be lost if the report was "made solely for the purpose of causing harm to the person defamed." *Brandon v. Gazette Publishing Co.,* 234 Ark. 332, 334, 352 S.W.2d 92, 94 (1961) (quoting the first *Restatement of the Law of Torts,* Vol. 3, § 611). Thus, the fair-report privilege could be lost if published with malice under the original Restatement. The modern view, codified in the Second Restatement, removes the malice requirement such that the privilege is lost only by a "showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment." *Restatement (Second) of Torts* § 611, cmt. b. *See also Rosenberg v. Helinski,* 616 A.2d 866, 678 (Md. App. 1992); *Lawton v. Georgia Television Co.,* 22 Media L. Rep. 2046 (Ga. Super. 1994); *Barry v. Time, Inc.,* 584 F. Supp. 1110, 1124, n. 15 (N.D. Cal. 1984) (noting that the difference between the actual malice standard and neutral reporting privilege is that the privilege applies regardless of the defendant's state of mind); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir. 1977), *cert denied sub nom., Edwards v. New York Times, Co.,* 434 U.S. 1002 (1997).

█ Here, appellant first argues that the fair-report privilege does not protect appellees because the televised report was not a fair and substantially true account of official court proceedings. However, a review of the media reports, including Roberts's videotaped affidavit, evidences no distortion of either Roberts's allegations or Butler's denials. In each report, Roberts's video clip alleging a

sexual encounter was followed by a statement of Butler's denial of any such occurrence. Further, KHOG–TV provided coverage when Butler filed his motion in response to Roberts's allegations and specifically noted that Butler's motion "includes a complete denial of the allegations made by Stephanie Roberts. In addition, Butler's attorneys provide thirteen documents they say support the denials. Included are various affidavits, plus a time sheet that contradicts the times given for the alleged sexual relationship."

Butler relies heavily on comment c to section 611 and argues that a person cannot confer the privilege upon himself by making the original defamatory statement and then reporting to others what he stated. For example, he may not confer the privilege upon a third person, "even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him." *Id.*, cmt. *c.* Given Butler's claim that Rhonda Justice colluded in the creation of Roberts's defamatory statements, he concludes that appellees are denied the privilege.

A later televised report addressed the alleged involvement of Rhonda Justice in the events and aired Roberts's statement that she came forward in response to Justice's intimation that she had photographs of Roberts and Butler. The report also included an interview with Justice, who denied having any photographs or telling Roberts or Butler that she had pictures. This particular story concluded by noting that Butler had no comment and that the station had been advised to refrain from further comment on the unfinished investigation.

In short, Butler's claim, that Justice colluded with Roberts and participated in the creation of the defamatory statements by threatening Roberts with the exposure of photographs, is unsupported by the record. Justice denied Butler's allegation, and Butler offered no proof that Justice made the original defamatory statements about Butler to Roberts. Similarly, Butler presented no proof that Justice made any statements to Roberts in order to induce her to repeat an account for the purpose of conferring the fair-report privilege upon Justice. Neither is there evidence that Justice arranged, in any way, to have the story published. Special Prosecutor Everett also concluded that it was unlikely that any photographs existed.

As a result, we find no factual basis in the record for Butler's conclusory allegations and, indeed, observe evidence supporting a contrary conclusion. For example, Roberts's attorneys explained their decision to disclose the allegations to the court via videotaped affidavit as furthering their obligation to provide Roberts with the proper representation. They related that the "video affidavit was not instigated by Rhonda Justice nor did she have any participation in the production of the video. The video was produced for the sole reason of defending Roberts and for placing what appeared to be truthful allegations before the proper forum." Thus, we conclude that no genuine issue of material fact has been presented on the question of whether the fair-report privilege applies. *See Clark v. Ridgeway*, 323 Ark. 378, 914 S.W.2d 745 (1996).

Butler's contention that the privilege should not apply because the affidavit was not part of an "official proceeding" is likewise unpersuasive. Butler reasons that the affidavit was filed as an exhibit to a motion for recusal but no "official action" was taken. Section 611 does state that a "report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported." Section 611 cmt. *e.* However, as appellees point out, the abstract of the record is devoid of any indication that Butler raised this issue before the trial court. Butler also failed to dispute this point in his appellate reply brief. Accordingly, we decline to reach the merits of his argument where the abstract does not reflect that appellant raised the issue below. *See Rainey v. Hartness*, 339 Ark. 293, 5 S.W.3d 410 (1999); *Barber v. Watson*, 330 Ark. 250, 953 S.W.2d 579 (1997).

In light of the foregoing, we cannot say that the trial court erred by finding that appellees' report was a fair and substantially true account of official court proceedings entitled to the fair-report privilege. Accordingly, we affirm the trial court's order granting appellees summary judgment as a matter of law.